IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

HUNTER BROWN AND
RONALD ALBRITTON,
Individually and On Behalf of All
Others Similarly Situated,

      Plaintiffs,

NO. 2:22-CV-00116 KJG-SMV

v.

EOG RESOURCES, INC.,

      Defendant.

**DEFENDANT EOG RESOURCES, INC.'S RESPONSE IN
OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION**

      Defendant EOG Resources, Inc. ("EOG") requests that the Court deny Plaintiffs' Motion for Conditional Certification ("Motion") (Doc. 18) and respectfully shows the Court as follows:

## I.      INTRODUCTION

      In this wage and hour lawsuit, Plaintiffs Hunter Brown ("Brown") and Ronald Albritton ("Albritton") (collectively, "Plaintiffs") assert that EOG misclassified them as independent contractors and improperly paid them a day rate with no overtime pay in violation of the Fair Labor Standards Act ("FLSA") and the New Mexico Minimum Wage Act ("NMMWA").  *See* Doc. 1 at 7. Plaintiffs' Motion addresses certification of only their FLSA claims.  Specifically, Plaintiffs seek to represent a nationwide class of "[a]ll water consultants working for EOG during the past three years who were classified as independent contractors and paid a day-rate with no overtime" regardless of location, job responsibilities, or contracting relationship with EOG.  *See* D.E. 18 at 7,19.

      Conditional certification is not warranted for several reasons.

      ***First,*** Plaintiffs seek to improperly amend their pleadings through their Motion.  Plaintiffs'

Complaint expressly *excludes* from the proposed class definition contractors who performed services for EOG through oilfield service contractor Bedrock PC 1099, LLC ("Bedrock"). Plaintiffs now seek certification of a *broader* class that *includes* these Bedrock workers. It is improper for Plaintiffs to circumvent the standard for amending a pleading—which is substantially different than the standard for conditional certification—by simply asserting a new, broader class definition in their Motion.

*Second,* Plaintiffs cannot establish that all putative class members were subject to a single pay decision, policy, or plan. Both Plaintiffs contracted directly with EOG through their own corporate entities—Hunter Brown Consulting and Ronald Albritton Consulting, LLC. Unlike the Plaintiffs, however, the majority of putative class members did not contract directly with EOG. Rather, the majority of putative class members provided services to EOG indirectly through one of more than twenty third-party vendors EOG contracted with in these regions. Each third-party vendor negotiated the terms of its contract with EOG. EOG did not dictate or otherwise control (and therefore is not aware of) how those vendors paid their personnel, i.e., the putative class members. Instead, irrespective of how EOG classified or paid for the water services, each vendor paid its personnel as it saw fit. As such, how the putative class members were paid was not the result of a single decision, policy, or plan promulgated by EOG, but rather the result of the ***many separate decisions, policies, or plans of each third-party vendor***.

District Courts in the Tenth Circuit deny conditional certification in cases such as here, where putative class members are not subject to a single action, policy or plan. *See, e.g., Nelson v. FedEx Ground Package System, Inc.*, No. 18-cv-01378, 2018 WL 6715897 (D. Colo. Dec. 21, 2018). In *Nelson*, the court denied conditional certification of a class of workers who were paid a day rate and provided services to FedEx through various independent service providers. *Id.* Because FedEx maintained separate contracts with each service provider, the court held the pay structure for the drivers was not

the result of a single decision, policy, or plan.  *Id.*  The same reasoning applies here.

*Third*, the putative class members are not sufficiently similarly situated.  Plaintiffs provided services to EOG directly through their own corporate entities.  They only provided services in the Permian Basin, covering western Texas and southeastern New Mexico, and their services were specific to the operational needs of those regions.  Plaintiffs argue in conclusory fashion they are "similarly situated" to all "water consultants" nationwide because they were classified as independent contractors, were paid a day rate, and "performed work in the oilfield."  *Id.* at 5-6.  Under Plaintiffs' logic, they are "similarly situated" to *every oilfield worker* who has provided *any service* to EOG on an independent contractor basis and was paid a day rate *irrespective of their contracting relationship, location worked, or duties.*  This an absurd result that is contrary to prevailing Tenth Circuit law and a distortion of the collective action mechanism that is geared towards efficiency. Plaintiffs cannot ignore the stark differences existing between them and putative class members who had a different contracting relationship with EOG; were thus subject to different terms and conditions, such as arbitration agreements; and performed different duties.

*Last*, Plaintiffs' proposed notice to the putative class members is improper because: (i) Plaintiffs request information from EOG that is more properly obtained from the third-party vendors and contractors; (ii) Plaintiffs inappropriately seek an extensive amount of personal information about putative class members; (iii) Plaintiffs' request to send notice through duplicative means, including text messages, is overly broad and unnecessary; (iv) the opt-in period should be limited to 60 days; and (v) any notice should inform putative class members of their discovery obligations.  For these reasons, and as more fully explained herein, conditional certification is not warranted.

## II.    <u>FACTUAL BACKGROUND</u>

**A.    EOG's Oil and Gas Business Requires Various Water Management Services.**

EOG is an independent crude oil and gas company.  Decl. of Joe Justus ¶ 3, attached Exhibit A.  As part of its domestic operations, EOG operates in numerous basins within Division Offices in Midland, Texas; San Antonio, Texas; and Denver, Colorado.  *Id.*  As an "operator," EOG is responsible for the exploration, development, and production of an oil or gas well.  *Id.* at ¶ 4.  To fulfill that responsibility, EOG contracts with various vendors and suppliers to provide the different services, personnel, and equipment required for its operations.  *Id.*

This case focuses on EOG's retention of water resources for its operations.  EOG uses water during its drilling, hydraulic fracturing ("fracking"), and completions operations.  *Id.* at ¶ 5.  EOG obtains this water from various sources, including surface water, fresh and non-fresh water aquifers, and (where possible) recycled/"reused" water.  *Id.*  Depending on the water source, EOG must arrange to obtain the water and transport the water to the operating location, typically through trucks or pipes.  *Id.*  Where pipes are used to transport the water, EOG requires field personnel to lay and maintain the pipelines.  *Id.*

In addition to the water used for its operations, EOG must also manage the removal of "produced water."  *Id.* at ¶ 6.  Produced water is the water that is brought to the surface during the extraction of oil and natural gas.  *Id.*  EOG must either reuse or dispose of the produced water in accordance with regulatory standards.  *Id.*  The regulatory standards require reused water to be properly cleaned, treated, and stored before reuse.  *Id.*  In sum, EOG's business and operations necessitate a variety of services to manage the water needed for or produced from its operations.  *Id.*

**B.    EOG Contracts with Various Third-Party Vendors and Contractors for Water Services.**

Because the water management services are ancillary to and not a core or integral aspect of EOG's business, EOG enters into Master Services Agreements ("MSA") for the water services needed. *Id.* at ¶ 7. Some MSAs are with third-party vendors, who then provide the personnel who perform the services for EOG. *Id.* Other MSAs are entered into directly with an individual contractor who performs the services. *Id.* In other cases, such as with Brown and Albritton, the independent contractors own their own limited liability company or other corporate entity and provide services to EOG under their own MSA. *Id.* at ¶¶ 7, 17, 18.

There is little overlap across divisions in the vendors and contractors used:

1. <u>Midland Division</u>. EOG has contracted with at least fourteen different vendors or contractors: 3CConsulting; 3S Services, LLC; Bedrock Petroleum Consultants, LLC; BES Engineering (d/b/a The Bergaila Company); Cielo Energy Consulting, LLC; Crosby Energy Services, Inc.; Hunter Brown Consulting; KO Construction; Nesco Service Company (d/b/a Nesco Resource LLC); Renegade Well Services; Rogue Industrial Group, LLC; Ronald Albritton Consulting, LLC; Tom E Lee Industries; and White Water Services, LLC. *Id.* at ¶ 8. The majority of these MSAs were with third-party vendors who then provided personnel to perform services for EOG. *Id.*

2. <u>San Antonio Division</u>. EOG contracted with at least six different vendors or contractors: Cielo Energy Consulting, LLC; McLain Consulting; Shane Balch Enterprises, LLC; SDS Petroleum Consultants, LLC; Water Glide Systems, LLC; and Willmo Sand Creek Enterprises, LLC. Decl. of Jake Morrison ¶ 4, attached as Exhibit B. The majority of these MSAs were directly with the corporate entities of various independent contractors. *Id.*

3. <u>Denver Division.</u> EOG primarily contracts with RigUp, Inc., also known as RUSCO. Decl. of Tom McCormick ¶ 3, attached as Exhibit C. EOG does not contract directly with any independent contractors in this division. *Id.*

Contrary to Plaintiffs' conclusory allegation, the contracting relationship between EOG and the various vendors and contractors who provide water services varies. Ex. A ¶ 9. In particular, not all individuals providing water services are paid the same. *Id.* Instead, EOG pays each individual in

accordance with the negotiated terms of their specific and applicable MSA. *Id.*

In instances where EOG contracts directly with the contractor or his corporate entity, that contractor directly negotiates the terms of pay. *Id.* ¶ 10. While some contractors negotiated and agreed to an hourly rate, others negotiated and agreed to a day rate. *Id.* Even among those paid a day rate, the day rate may be higher or lower depending on the negotiated rate. *Id.* For example, while Brown negotiated a day rate of $700, Albritton negotiated a day rate of $775. *Id.* at ¶¶ 17, 18.

In contrast, in cases where EOG contracted with a third-party vendor to provide personnel, EOG does not dictate or control how the vendor pays its personnel. *Id.* at ¶ 11; Ex. C at ¶4 . Instead, EOG is only responsible for paying the vendors' invoices. *Id.* The vendor then presumably pays its personnel. *Id.* Thus, the amount invoiced by the third-party vendor and paid by EOG is highly unlikely to be reflective of the actual amount received by the vendor's personnel, since the third-party vendor shares in the funds paid by EOG. *Id.*

There exist other differences in addition to the differences in pay. Ex. A at ¶ 12. For example, unlike with third-party vendors, in some instances EOG waived the insurance minimum requirements for contractors operating as a sole proprietorship. *Id.* Further, some third-party vendors, such as Bedrock and RUSCO, required their personnel to sign arbitration agreements. *Id.*

C.    **Water Management Services Vary Based on Geographic Region.**

Every oil and gas producing region is unique, presenting different water challenges and opportunities. *Id.* at ¶ 13. For example, the amount of water available for use and the amount of water produced in drilling operations varies by geographic region. *Id.* Transportation and disposal options also vary across the different regions. *Id.* Due to these differences, each region has different water needs and EOG's approach to water management differs in each region. *Id.*

###### 1.     *Midland, Texas Division*

EOG's Midland Division oversees EOG's oil and gas operations in the Permian Basin.  *Id.* at ¶ 14.  In the Permian Basin, the ratio of produced water for every barrel of oil is very high, such that the reuse of water is a viable and preferred option.  *Id.*  In fact, over 99% of the water EOG sources in Midland, Texas is from reuse or non-fresh water sources.  *Id.*  Moreover, due to the infrastructure available, over 99% of the Permian Basin water is transported via pipe.  *Id.*

Because the majority of water sourced in the Midland Division is reuse water, the produced water must be safely transferred from the producing well to a pit where the water is cleaned and chemically treated before reuse in accordance with specific safety requirements and regulations.  *Id.* at ¶15.  Thus, contractors in this Division must be familiar with the rules and regulations in both west Texas and southeastern New Mexico due to the geographic span of the Permian Basin.  *Id.*  Once cleaned, the water must be transported into ponds where it is stored before the next frac.  *Id.*  Due to the large pipeline infrastructure, this Division also requires water services specific to supervising the installation and maintenance of the pipelines.  *Id.*

Contractors in this Division provide water services for drilling, completions, transfer or reuse operations.  *Id.* at ¶16.  Reuse operations require 24/7 oversight.  *Id.*  Thus, there are typically two contractors assigned per well for reuse operations, each assigned to a 12-hour day or night shift.  *Id.* In contrast, only one contractor manages the water services for drilling and completions.  *Id.*

###### 2.     *San Antonio, Texas Division*

EOG's San Antonio Division oversees EOG's operations in the Eagle Ford shale.  Ex. B at ¶ 5.  In stark contrast to its operations in the Midland Division, EOG does not have any reuse operations in the San Antonio Division.  *Id.*  Moreover, unlike the wells in the Midland Division, the wells in the San Antonio Division have significantly lower produced water volumes.  *Id.*  Instead, the majority of

water is sourced from aquifers containing freshwater. *Id.* Water is primarily transported by truck. *Id.*

Because there are no reuse operations in the San Antonio Division, the water services in this Division focus on the sourcing and transportation of water from water supply wells. *Id.* at ¶ 6. Contractors in this Division must contract various freshwater suppliers (often by phone) to coordinate the delivery of water. *Id.* The water is then transported directly from an aquifer to a pit where it is accessible for operations. *Id.* Because water is not reused, produced water must also be safely disposed. *Id.* Contractors in this Division must be familiar with local regulations that govern the use of water from aquifers. *Id.* In addition, they must collect water samples for testing and submit reports to the local water boards governing the use of water from aquifers. *Id.*

Contractors in this Division serve as water resource consultants, transfer consultants, or water maintenance consultants. *Id.* at ¶7. Unlike reuse operations, freshwater operations do not require 24/7 oversight. *Id.* Thus, there is typically only one water resource consultant assigned per well to coordinate the supply and delivery of water. *Id.* Transfer consultants, on the other hand, are responsible for coordinating the laying of pipes in accordance with the applicable rights of way. *Id.* Finally, the water maintenance consultants are solely responsible for maintaining the equipment and tracking the use of EOG's equipment by various lessors on site. *Id.*

### 3. *Denver, Colorado Division*

EOG's Denver Division oversees EOG's oil and gas operations in the DJ Basin in Colorado and Wyoming, the Powder River Basin in Wyoming, and in the Williston Basin in North Dakota. Ex. C at ¶5. The major water source in this Division is produced water. *Id.* Most of the water is transported via laid pipelines. *Id.*

EOG relies on contractor services of water transfer operators to manage its water needs in this Division. *Id.* at ¶6. Water transfer operators are primarily responsible for coordinating the

transportation of water for drilling and completions operations. *Id.* In addition, they are tasked to

ensure zero spills and zero safety incidents. *Id.* Moreover, they are responsible for laying temporary

lines (when necessary due to a lack of permanent infrastructure) used to transport water as well as

transporting and maintaining the equipment and pipes while in operation. *Id.* This includes installing

leak detection equipment to ensure early and prompt leak detections. *Id.* In contrast to the contractors

providing water services in the Midland Division, water transfer operators in the Denver Division are

not responsible for sourcing the water and they do not oversee the cleaning or treatment of produced

water. *Id.* Water transfer operators in this Division work 12-shifts, split between a day shift and a

night shift. *Id.* Typically, there are four to seven water transfer operators assigned per shift, including

a lead water transfer operator. *Id.*

### D.   Brown Agreed To Provide Services as an Independent Contractor in EOG's Midland Division Through His Own Corporate Entity.

Brown provided water services in EOG's Midland Completions Department from June 2014

through March 2020, in west Texas and New Mexico. Ex. A at ¶ 17. EOG entered into an MSA with

Brown's own corporate entity, Hunter Brown Consulting. *Id.* In entering into the MSA, Brown

agreed that he was an independent contractor:

> In the performance of any Services by Contractor for Company, Contractor shall be conclusively deemed an independent contractor, with the authority and right to direct and control all of the details of the Services, Company being interested only in the results obtained. . . . It is the understanding and intention of the Parties hereto that no relationship of master and servant or principal and agent shall exist between Company and the employees, agents, or representatives of Contractor.

*See* 2018 MSA, attached as Ex. A-1 ¶ 6A.

In executing the MSA, Brown also agreed to comply with the FLSA:

> CONTRACTOR HEREBY AGREES AND ACKNOWLEDGES THAT IT SHALL BE SOLELY RESPONSIBLE FOR THE CLASSIFICATION OF THE STATUS OF ALL PERSONNEL, LABOR, OR OTHER WORKERS WITH

RESPECT TO THE PERFORMANCE OF ITS OBLIGATIONS TO COMPANY, INCLUDING, BUT NOT LIMITED TO, ALL DESIGNATIONS OF: (A) INDEPENDENT CONTRACTOR OR EMPLOYEE STATUS; (B) EXEMPT OR NONEXEMPT DESIGNATIONS; AND (C) RECORDKEEPING AND PAYMENT OF CONTRACTOR'S PERSONNEL IN ACCORDANCE WITH THE FAIR LABOR STANDARDS ACT (FLSA) AND ANY APPLICABLE STATE LAW.

*Id.* ¶ 10 (capitalization in original).  What is more, Brown represented himself as an independent contractor to state government agencies.  *See* State Documents, Ex. A-2.  Because he signed a Certification of Sole Proprietorship, EOG waived the insurance requirements for him.  *Id.* at ¶ A-3.

Brown negotiated the prices for his services based on competitive rates.  *Id.* at ¶ 17.  In particular, Brown negotiated and agreed to a day rate of $700 per day and additional mileage reimbursement.  *Id.*  In 2019, Brown invoiced EOG approximately $270,000 for his services.  *Id.*  In 2020, Brown invoiced EOG approximately $40,000 for his services over a two-month period.  *Id.*

### E.    Albritton Agreed To Provide Services as an Independent Contractor in EOG's Midland Division Through His Own Corporate Entity.

Albritton provided water services in EOG's Midland Division from August 2012 to December 2021.  Ex. A at ¶ 17.  EOG entered into an MSA with Albritton's personal corporate entity, Ronald Albritton Consulting LLC.  *Id.*  In entering into the MSA, Albritton agreed that he was an independent contractor, contrary to the argument he is making in this case.  *See* 2018 MSA, attached as Ex. A-4 ¶ 6A.  He also agreed to comply with the FLSA.  *See id.* ¶ 10.  Further, Albritton represented to state government agencies that he was an independent contractor.  *See* State Documents, attached as Ex. A-5.  EOG waived the insurance requirements for Albritton.  *Id.* at ¶ A-6.

Albritton negotiated a day rate of $775 per day and mileage reimbursement.  *Id.* at ¶ 17.  Albritton invoiced EOG the following amounts: approximately $240,000 in 2019; approximately $180,000 in 2020; and approximately $126,000 in 2021.  *Id.*

While other contractors provided water services for EOG's drilling, completions, or reuse operations, Albritton was the only contractor tasked with providing services specific to EOG's limited freshwater operations in the Midland Division. *Id.* at ¶ 18. He. *Id.* He was responsible for contacting freshwater suppliers to coordinate the delivery of water, ensuring the pumps were functioning, and ensuring the ponds used to store freshwater remained at capacity. *Id.* The majority of the water storage ponds in the Midland Division are automated, such that Albritton could oversee the various ponds remotely; Albritton was only required to physically visit the ponds on occasion. *Id.* As a contractor, Albritton provided his own vehicle and tools. *Id.*

In 2021, Albritton was offered the opportunity to serve in EOG's water transfer operations in the Midland Division as an independent contractor paid on an hourly basis. *Id.* Ironically, Albritton declined EOG's offer for hourly payment for his services instead of the day rate, stating that he did not want to be paid on an hourly basis. *Id.*

## IV.    ARGUMENTS & AUTHORITIES

### A.    Plaintiffs Improperly Seek To Amend their Pleadings Through Their Motion.

In their Complaint, Plaintiffs expressly exclude water consultants who were hired by Bedrock and performed services for EOG.[1] *See* D.E. 1 ¶ 3. Plaintiffs excluded the Bedrock workers from this case because their counsel filed an identical copycat lawsuit against EOG in the Southern District of Texas involving contractors who performed water services through **Bedrock only**. *See Porter v. EOG Resources, Inc.*, No. 4:22-CV-524, (S.D. Tex. Feb. 17, 2022). The plaintiff in the *Porter* lawsuit has been compelled to arbitration. As a result, Plaintiffs now seek to sidestep the turn of events in *Porter* with

---

[1]    *See* Doc. 1, ¶ 3 (alleging a class definition of "[a]ll water consultants working for EOG during the past 3 years who were classified as independent contractors and paid a day-rate with no overtime, **except those hired through Bedrock PC 1099, LLC**" (emphasis added)).

a new, unpled, expanded class definition asserted for the first time in their Motion.

Plaintiffs, and the Court, are bound by the class definition contained in the Complaint. *See Costelo v. Chertoff*, 258 F.R.D. 600, 604-05 (C.D. Cal. 2009); *Berlowitz v. Nob Hill Masonic Mgmt., Inc.*, 1996 WL 724776, *2 (N.D. Cal. Dec. 6, 1996) (same). Plaintiffs may not expand their class definition through a motion to certify the class. *See, e.g., Phelps v. Parsons Technical Support, Inc.*, 2010 WL 4386918, *3-4, (S.D. Ind. Oct. 29, 2010); *Nerland v. Caribou Coffee Co., Inc.*, 564 F. Supp.2d 1010, 1033, fn. 12 (D. Minn. 2007). Rather, the express terms of the complaint establish the operative class definition. *Nerland*, 564 F. Supp. 2d 1033, fn. 12.

The Court's consideration of a class definition not contained in the complaint results in the court either *sua sponte* engaging in, or allowing the parties, de facto amendments of the pleadings. *Id.*; *Heastie v. Comty. Bank of Greater Peoria*, 125 F.R.D. 669, (N.D. Ill. 1989) ("we refuse[] to treat the motion for class certification as a "de facto amendment" of the pleading[.]"); *Cf. Bennett v. Cent. Telephone Co. of Ill.*, 97 F.R.D. 518, 521 (N.D. Ill. 1983) (finding that motion to "clarify" or "amend" the class definition is, in effect, an effort to amend the complaint). Accordingly, in order to have their new class definition considered, Plaintiffs (who seek certification of a class different and broader than the class defined in their Complaint) must obtain leave to amend their Complaint. *See Clarke v. Baptist Mem'l Healthcare Corp.*, 264 F.R.D. 375, 381 W.D. Tenn. 2009 ("To accommodate a new proposed class definition, plaintiffs will need to amend the complaint."); *Costelo*, 258 F.R.D. at 604-05 ("The Court is bound to class definitions provided in the complaint and, absent an amended complaint, will not consider certification beyond it.").

Rule 15(a) of the Federal Rules of Civil Procedure expressly sets out the standard for amending a pleading. Fed. R. Civ. 15(a); *Lymon v. Aramark Corp.*, No. 08-0386, 2009 WL 5220285, at *3 (D.N.M. Dec. 12, 2009). That standard is substantially different than the standard for conditional certification

under the FLSA.  Plaintiffs cannot avoid the standard imposed by Rule 15 through a backhanded attempt to amend their pleadings by merely proposing a new, much broader class definition.

To be clear, Plaintiffs' new proposed class definition raises several important legal issues.  For instance, whether Plaintiffs' claim should be dismissed under the first-to-file rule or transferred pursuant to 28 U.S.C. § 1404(a).  *See Hitex, LLC v. Vorel*, No. 1:21-CV-697, 2021 WL 5544942, at *2 (D.N.M. Nov. 26, 2021) (analyzing both legal issues).  Or, whether consultants who signed arbitration agreements should be dismissed and compelled to arbitration.  *Ferrell v. Cypress Envtl. Mgmt.-TIR, LLC*, No. 20-5092, 2021 WL 5576677, at *4 (10th Cir. Nov. 30, 2021) (reversing denial of motion to compel arbitration).  By seeking to improperly amend their pleadings through their Motion, Plaintiffs deny EOG any opportunity to respond to unpled allegations and properly assert its defenses.  As a result, the Court should deny Plaintiffs' request to certify this unpled class.

**B.   Conditional Certification Is Not Automatic, and Plaintiffs Bear the Burden To Prove It Is Warranted.**

The FLSA permits an individual plaintiff to bring a lawsuit on "behalf of himself . . . and other employees similarly situated."  29 U.S.C. § 216(b).  The plaintiff bears the burden of proving that conditional certification of a class is warranted.  *See Eagle v. Freeport-McMoran, Inc.*, No. 15-cv-00577, 2016 WL 7494278, at *3-4 (D.N.M. Aug. 3, 2016).  Courts have emphasized that, although certification under the FLSA is more lenient than that for a Rule 23 class action, certification is "by no means automatic."  *Id.*

To determine whether a proposed class is "similarly situated" under FLSA Section 216(b), district courts within the Tenth Circuit most commonly apply a two-step *ad hoc* approach approved in *Thiessen v. GE Capital Corp.*  267 F.3d 1095, 1105 (10th Cir. 2001); *Guarriello v. Asnani*, 517 F. Supp. 3d 1164, 1171 (D.N.M. Feb. 5, 2021) (explaining how district courts apply the two-step *Thiessen*

approach).  Under the first step of *Thiessen*, a court typically makes an initial "notice stage" determination of whether the plaintiffs are "similarly situated" before the completion of discovery. *Eagle*, 2016 WL 7494278, at *2.  The second step is the "decertification stage," which occurs after discovery is largely complete and involves a more stringent fact-intensive review to determine if the claimants are similarly situated.  *Id.*

Because the parties have not engaged in discovery, the first stage of *Thiessen* applies here and requires Plaintiff to provide "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan."  *Id.*  Some "[c]ourts evaluate several factors in this initial determination, including whether potential class members: (i) have the same employer; (ii) are subject to the same employer practices; (iii) suffer the same method of calculation of wages owed; and (iv) allege FLSA violations based on the same conduct."  *Id.* (citation omitted).  On the other hand, "some courts focus more on the similarity between job duties and pay provisions of the plaintiffs and those in the proposed class."  *Id.* (citations omitted).

C.    **Conditional Certification Is Not Warranted.**

1.    *Plaintiffs Cannot Show that the Putative Class Members Were Subject to a Single Pay Decision, Policy, or Plan.*

Plaintiffs fail to meet their burden of proving that conditional certification of a class of all "water consultants" nationwide is warranted.  At the outset, Plaintiffs fail to identify a ***single*** decision, policy, or plan that applied to ***all*** the individuals who provided water services to EOG ***nationwide***. Moreover, Plaintiffs' conclusory declarations are insufficient to warrant conditional certification.

a)    *Putative class members provided services to EOG through various third-party vendors*

There exist significant differences in the contracting relationship between (i) EOG and the Plaintiffs and (ii) EOG and the putative class members who provided services to EOG through a

variety of third-party vendors.  Brown and Albritton each signed their own MSA on behalf of their respective corporate entity.  Ex. A at ¶¶ 17, 18.  Notably, Brown and Albritton provide no details as to how their rate of pay was decided, who decided the rate, who reviewed and approved invoices, or any instructions they claim to have received about their pay.  Regardless, their contracting relationship was governed by the terms of the MSAs they individually negotiated and accepted.  While Albritton asserts that he did not negotiate his pay and his pay was dictated by EOG (*see* D.E. 18-2 ¶3), he fails to explain how or why his rate was higher than Brown's.

Importantly, unlike the Plaintiffs, the majority of the putative class members did not have their own MSAs with EOG.  Rather, most of the other putative class members provided services through third-party vendors, each of which had its own MSA with EOG.  EOG contracted with at least fourteen different vendors or contractors in the Midland Division, the majority being with third-party vendors who then provided personnel to perform the services.  Ex. A at ¶ 8.  In the San Antonio Division, EOG contracted with at least six different companies and/or contractors and the majority of these MSAs were directly with the corporate entities of various independent contractors.  Ex. B at ¶ 4.  In the Denver Division, EOG primarily contracted with RigUp and did not contract directly with any individual independent contractors.  Ex. C at ¶ 3.

The facts of the direct working relationships enjoyed by Brown and Albritton are significantly different from the contracting relationships of the putative class members who worked through the third-party vendors.  With third-party vendors, EOG paid the amount invoiced by the vendor and the vendor, in turn, was responsible for paying its personnel.  Ex. A at ¶ 11; Ex. C at ¶ 4 .  EOG did not dictate or control how those vendors paid their personnel.  *Id.*  Thus, EOG does not know the terms and conditions of the compensation paid by the vendors to the vendors' personnel.  Even more, the amount invoiced by the third-party vendor and paid by EOG is highly unlikely to be reflective of the

actual amount received by the vendor's personnel, since the third-party vendor will share in the funds paid by EOG. *Id.*

In addition to differences in pay, putative class members who provided services to EOG may have had other requirements and obligations imposed by their respective vendors. For example, while EOG waived the insurance requirements for Brown and Albritton, it did not necessarily do so for the third-party vendors and it is unclear to EOG how this impacted the insurance requirements for specific individuals providing services through vendors. Further, some third-party vendors, such as Bedrock and RUSCO, required their personnel to sign arbitration agreements—which was not a requirement for either Plaintiff. *Id.* Notably, and as discussed in more detail below, Plaintiffs' Motion is devoid of any evidence establishing the terms of the contracting relationship between putative class members and their respective employers, including their compensation terms and conditions.

To be sure, the fact that all individuals who provided water services to EOG were classified as independent contractors does not alone show that they were subject to the same pay decision, policy, or plan. Plaintiffs still have no evidence that EOG expressly promulgated and bound each of the third-party companies and contractors to a single pay decision, policy, or plan. The *Nelson* case, which was decided by another district court in this Circuit, is illustrative. 2018 WL 6715897, *1-2. In *Nelson*, plaintiff was an independent contractor delivery driver who worked for Harmony Express. *Id.* at *1-2. Harmony Express was one of the many independent service providers that contracted with FedEx for delivery services. *Id.* Plaintiff sought to certify a class of "[a]ll current or former Colorado FedEx drivers." *Id.* at *2. In support of his motion, the plaintiff submitted the declarations from other drivers who provided services to FedEx through *other* service providers, attesting that the "pay formula [was] the same for drivers" and was "basically universal" because they were all paid a day rate with no overtime. *Id.* at *2, *9. The court found that the plaintiff provided "substantial allegations"

establishing that FedEx and the service providers worked closely in managing the driver and most if not all operational details of the service providers' businesses and that the drivers were paid a day rate with no overtime. *Id.* at \*5. However, the court held there was no evidence that FedEx "expressly promulgated and bound [Harmony Express or other service providers] to a single action, policy, or plan to affect a universal pay structure applicable to Plaintiff and other drivers." *Id.* The court held *that conditional certification was not proper without evidence of defendant's actual participation in the third-party employer's decision in how to pay its employees. Id.* (emphasis added). As a result, the court denied conditional certification under the first *Thiessen* step. *Id.*

The same reasoning applies here. Plaintiffs allege through their own boilerplate declarations that "water consultants" were "all subject to a common, illegal compensation plan" because they were all paid a day rate with no overtime pay. But Plaintiffs have not put forward a shred of evidence suggesting that EOG "expressly promulgated and bound [the third-party companies] to a single action, policy, or plan to affect a universal pay structure applicable to Plaintiff[s] and other [potential class members]." *Id.* In fact, the opposite is true. The MSAs with the third-party vendors and individual contractors expressly left the compensation decision up to them. There is simply no evidence that EOG "promulgated and bound" the vendors and contractors to pay a certain way. In sum, how putative class members were paid was not the result of a *single* decision, policy, or plan and thus conditional certification is not warranted.

b)    *Plaintiffs' nearly uniform conclusory declarations and hearsay do not support conditional certification*

Plaintiffs also lack additional credible evidence that conditional certification is warranted. Plaintiffs assert that they have made a "strong preliminary showing, through their well-pleaded Complaint, declarations, and documents in their possession that EOG subjected them and all other

Water Consultants to the same compensation policies." D.E. 18 at 15. To be clear, Plaintiffs' "evidence" is made up solely of their own nearly identical declarations that contain self-serving statements that either simply track the elements of an FLSA misclassification claim or constitute inadmissible hearsay.

Courts have denied conditional certification when the supporting declarations contain unsupported or conclusory statements because such declarations add very little support to the named plaintiff's allegations. *See, e.g., Shaw v. Bar S Servs., Inc.*, No. 20-CV-104-SWS, 2021 WL 7211095, at *3 (D. Wyo. Apr. 30, 2021) ("[C]onditional certification is appropriately denied where a complaint is conclusory in nature, the supporting affidavit relies upon hearsay from unidentified sources and the nature of the violation is rendered ambiguous by the particular circumstances of only the named plaintiff."); *Eagle*, 2016 WL 749278, at *4 ("Unsupported or conclusory allegations are insufficient to show that Plaintiff and putative class members are similarly situated at the notice stage").

Plaintiffs' own declarations fail to put forth ***any details*** other than a recitation of the elements of an FLSA claim and conclusory generalities regarding their working conditions. *Shaw*, 2021 WL 7211095, at *3 (holding unsupported assertions that FLSA violations extended throughout the company to all non-exempt workers were insufficient to support conditional certification); *Saarela v. Union Colony Protective Servs., Inc.*, No. 13-cv-01637, 2014 WL 3408771, at *3 (D. Colo. July 14, 2014) (finding allegations that "[defendant] failed to pay premium overtime pay for hours worked by Plaintiff and other employees in excess of twelve per day and/or forty per week" and that defendant "failed to calculate the overtime rate properly," and "required Plaintiff and other employees to pay the costs of uniforms and equipment" were conclusory).

Even more, while Plaintiffs seek to certify a ***nationwide*** class of "water consultants" they lack knowledge as to the services provided or the terms under which those services were provided outside

of the Midland Division. Here, Brown and Albritton only provided services in west Texas and New Mexico. *See* D.E. 18-1 at ¶3; D.E. 18-2 at ¶2. Plaintiffs do not submit a declaration by which to compare against the potential class members. Plaintiffs neither identify other individuals who worked under a different MSA, nor provide any examples of other MSAs. Moreover, Plaintiffs have no knowledge as to who determined the rate of pay under those MSAs, how that rate was decided, who reviewed and approved invoices, or any instructions putative class members may have received about their pay. Plaintiffs simply cannot meet their burden of showing that all individuals who provided water services to EOG nationwide were subject to a single pay decision, policy, or plan, when they have no personal knowledge of how the putative class members were paid under their applicable MSAs. At most, Brown and Albritton can provide allegations regarding *their* own compensation for *their* services in *their* division.

Courts have refused to conditionally certify nationwide collection actions where, as here, the plaintiff does not have personal, first-hand knowledge of the policies or practices at offices or locations beyond those in which he/she has actually worked. *See, Guarriello v. Asnani*, 517 F. Supp. 3d 1164, 1174 (D.N.M. 2021) (refusing to "draw dramatic inferences" in order to certify a nationwide class when plaintiff's declaration contained no statements indicating that she had personal knowledge of policies or work conditions at defendant's other locations); *Pegues v. CareCentrix, Inc.*, No. 12-2484-CM, 2013 WL 1896994, at *3 (D. Kan. May 6, 2013) (holding plaintiff did not submit substantial allegations that she was similarly situated to employees outside of her team because she did not offer any firsthand knowledge of practices in other units or locations).

To be clear, Plaintiffs cannot attempt to bolster their declarations with hearsay from unidentified sources. Even under the lenient standard at this stage, "mere conclusory declarations or those based on hearsay or speculation are insufficient to grant conditional FLSA collective action

certification." *Saarela*, 2014 WL 3408771, at *1. Both Brown and Albritton state their belief that other contractors were subjected to the same pay practices is based on their "personal knowledge drawn from [their] experience and observations working for EOG," "conversations with other water consultants classified by EOG as independent contractors and paid a day rate," and their "familiarity with EOG's payroll practices and policies." *See* D.E. 18-1 at ¶19; D.E. 18-2 at ¶7. Other courts in this Circuit reject this sort of purported evidence:

> Taken as a whole, these allegations are relatively thin. [Plaintiff's] statement that he reached "an understanding" of [defendant's] overtime policies based on 'conversations with other security guards' **essentially attempts to convert the hearsay statements of these unidentified employees into substantive evidence that [defendant's] pay policies are as [plaintiff] describes.**

*Saarela*, 2014 WL 3408771, at *3; *Shaw*, 2021 WL 7211095, at *3 (holding plaintiff's own speculation and hearsay conversations with other unidentified workers regarding their compensation were insufficient). Accordingly, Plaintiffs have failed to submit credible evidence to show conditional certification is appropriate here.

### 2.    *All Individuals Providing Water Services Are Not Similarly Situated.*

Plaintiffs also fail to establish that they are similarly situated to the proposed class members. Despite Plaintiffs efforts to paint all individuals who provided water services as "water consultants" who are one and the same, there are meaningful differences preventing conditional certification here.

#### a)    *Plaintiffs cannot include individuals who signed arbitration agreements in the proposed class*

As a threshold matter, any potential class member who signed an arbitration agreement should not be included in the class definition or receive notice. The Tenth Circuit has repeatedly held that there is a strong federal policy of enforcing arbitration agreements. *See Gidding v. Fitz*, 752 F. App'x 656, 658 (10th Cir. 2018). Two federal circuit courts have re-affirmed federal policy as to individuals

who signed arbitration. *See Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1050 (7th Cir. 2020) (holding that potential class members who signed arbitration agreements were excluded from the potential class and should not receive notice); *In re JPMorgan Chase & Co.*, 916 F.3d 494, 504 (5th Cir. 2019) (holding that notice sent to putative plaintiffs who entered into individualized arbitration agreements was inappropriate). Both Circuits (the only two to address the issue) uniformly held that it is error for a district court to issue notice to a worker who signed an arbitration agreement covering the issue.

As illustrated by the *Porter* lawsuit that Plaintiffs' counsel is now trying to sidestep, Bedrock required its personnel to execute arbitration agreements. *See Porter*, No. 4:22-CV-524, D.E. 14 (May 13, 2022). Other third-party vendors, such as RUSCO, also required its personnel to execute arbitration agreements, and this Court has enforced those arbitration agreements in other litigation brought by independent contractors in FLSA cases. *See Rogers v. 3Bear Energy, LLC*, 2022 WL 1303174, at *4 (D.N.M. May 2, 2022) (allowing RUSCO to intervene in a FLSA lawsuit brought against an oil and gas company and compelling the contractor to arbitration). It is improper for Plaintiffs—who did not sign arbitration agreements—to seek to represent those who did.

<b>b)</b> <i><b>The duties of the putative class members varied by geographic region</b></i>

In addition to the direct versus indirect working relationship mentioned above, Plaintiffs fail to account for the fact that the putative class also differs in terms of their duties and responsibilities. For example, in the Midland Division, where operations heavily rely on reused water, the contractors providing water services were responsible for safely transferring produced water from the producing well to a pit where the water is cleaned and chemically treated before reuse in accordance with specific safety requirements and regulations. Ex. A at ¶ 15. In contrast, in the San Antonio Division, the water services provided focused on the sourcing and transportation of water from water supply wells,

transporting water directly from an aquifer to a pit, safely disposing of produced water, and complying with reporting obligations of local water boards. Ex. B at ¶ 6.

Perhaps because they realize the stark differences in duties and responsibilities among the individuals who provided water services to EOG across its multi-basin operations, Plaintiffs broadly state that "water consultants were charged with ensuring that EOG had enough water to sustain its drilling and completions projects at its drill sites." D.E. 18 at 8. Courts have rejected such broad sweeping descriptions of a plaintiff's job duties. For instance, in *Mathis v. Stuart Petroleum Testers*, the plaintiff attempted to certify a class of all pump supervisors and field supervisors. No. 16-cv-094, 2016 WL 4533271 (W.D. Tex. Jan. 29, 2016). The plaintiff broadly stated his duties included "working at oil well sites to assist in pumping and fracking oil wells." *Id.* at *1. The court denied conditional certification because plaintiff's "filings include no additional description of what basic tasks his job (or the job of a pump supervisor or field supervisor more generally entails)." *Id.* at *2. In particular, the description "maintaining and operating the equipment used at the oilfield wellsites" was "so broad that it could include nearly any worker performing some manual labor at a well site, even if that worker had vastly different job duties than those of the Plaintiff." *Id.*

Plaintiffs' allegations are equally vague here. As in *Mathis*, Plaintiffs' general description of duties are insufficient to warrant class certification because they are so broad that it could encompass any worker who in some way assessed the water supply, even if that worker had vastly different duties than those of the Plaintiff or worked at a different location. Because Plaintiffs cannot show that the proposed class members are similarly situated, conditional certification is not warranted.

### D.    Plaintiffs' Proposed Notice and Consent Are Improper.

While EOG objects to the distribution of Plaintiffs' proposed notice, briefing on this issue is premature because conditional certification is inappropriate. EOG respectfully requests that in the

event the Court deems conditional certification proper (which EOG submits that it is not), the Parties be allowed to confer on the notice and method of distribution.

Out of an abundance of caution, EOG outlines its initial objections. First, Plaintiffs request that EOG produce a list of names, last known addresses, telephone numbers, e-mail addresses (business and personal), work locations, and dates of employment for the potential class members within 14 days. EOG did not employ the potential class members. The third-party vendors and contractors presumably possess this information. While Defendants will cooperate in the process (even though conditional certification is not warranted), Plaintiffs should bear the burden of gathering this information from the third-party vendors or the individual contractors.

Second, the extensive amount of personal information Plaintiffs request is inappropriate, as it implicates potential privacy and identity theft concerns. *Roggenkamp v. Bold Transp., Inc.*, No. 2:21-CV-02036, 2021 WL 7209984, at *4 (D. Kan. June 16, 2021) (denying plaintiff's request for phone numbers and only requiring last known address and email address)*; see Garcia v. TWC Admin., LLC*, No. 14-CV-985, 2015 WL 1737932, at *4 (W.D. Tex. Apr. 16, 2015) (same).

Third, sending notice three duplicative ways (by mail, e-mail, and text) is overly broad and unnecessary. Courts continue to find that distribution of notice by first class mail is sufficient. *See, e.g., Ward v. Express Messenger Sys., Inc.*, No. 17-CV-02005, 2018 WL 1604622, at *7 (D. Colo. Apr. 3, 2018) ("[T]he court finds that the use of First Class Mail, email, and text message is excessive. Typically, First Class Mail is sufficient . . . ."); *Reab v. Elec. Arts, Inc.*, 214 F.R.D. 623, 630–31 (D. Colo. 2002) (same); *see also Hernandez v. Helix Energy*, No. 18-1588, 2019 WL 126904, at *3 (S.D. Tex. Jan. 8, 2019). In particular, the request for notice through text messages is not proper. Text messaging is typically only allowed if there is proof that the defendant regularly communicated with the potential class members by text message, which Plaintiffs have not provided here. *Butler v. TFS Oilfield Servs.,*

*LLC*, No. 16-CV-1150, 2017 WL 7052879, at *7 (W.D. Tex. Sept. 26, 2017); *Bewley v. Accel Logistics, Inc.*, No. 17-CV-0676, 2018 WL 2422043, at *4-5 (N.D. Tex. May 7, 2018). Fourth, Plaintiffs' proposed email and text message notices are improperly addressed to "EOG oilfield workers" which is not consistent with the proposed class.

Fifth, Plaintiffs' request for a 90-day opt-in period is excessive. Instead, courts usually limit this to a 60-day opt-in period. *LeBlanc v. Halliburton Co.,* No. 7-cv-0718 KG-GJF, 2018 WL 3999567, at *3 (D.N.M. Aug. 21, 2018) (Gonzalez, J.) (limiting the notice period to 60 days); *Zamora v. Sw. Glass & Glazing, Inc.*, No. 1:15-CV-01041-RJ, 2016 WL 10516172, at *4 (D.N.M. Aug. 23, 2016) (same); *Ward v*, 2018 WL 1604622, at *7 (collecting cases).

Sixth, any notice should notify potential class members of their obligations if they join the lawsuit. *Ward v*, 2018 WL 1604622, at *7 (holding notice and consent form insufficiently apprised putative opt-ins of their requirements and/or demands of participating, including, but not limited to, that they may be required to participate in written discovery, appear for deposition, or appear for trial). Thus, any notice should include the following language: "**If you choose to join in the suit, you may be asked to: (1) appear for a deposition; (2) respond to written discovery; (3) produce documents and/or (4) appear at a trial.**"

## V.    **CONCLUSION**

Defendant EOG Resources, Inc. respectfully requests that the Court deny Plaintiffs' Motion for Conditional Certification. Should the Court conditionally certify any FLSA collective action and authorize notice to putative class members, Defendant requests that the Court order modification of the proposed form of notice and consent as outlined above and provide adequate time for the Parties to confer and submit an alternative form of proposed notice.

July 29, 2022                    Respectfully submitted,

**HOLLAND & HART LLP**

By: /s/ *Robert J. Sutphin*
Robert J. Sutphin
John C. Anderson
Little V. West
110 North Guadalupe, Suite 1
Santa Fe, New Mexico 87501
Tel: 505.988.4421
Fax: 595.983.6043
rsutphin@hollandhart.com
jcanderson@hollandhart.com
lvwest@hollandhart.com

**NORTON ROSE FULBRIGHT US LLP**
/s/ *Carter Crow*

    M. Carter Crow (admitted *pro hac vice*)
    Kimberly Cheeseman (admitted *pro hac vice*)
    Jesika Silva Blanco (admitted *pro hac vice*)
Fulbright Tower
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone:      (713) 651-5151
Facsimile:      (713) 651-5246
carter.crow@nortonrosefulbright.com
kimberly.cheeseman@nortonrosefulbright.com
jesika.blanco@nortonrosefulbright.com

*Counsel for Defendant EOG Resources, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

   This pleading was served on the following opposing counsel via the Court's CM/ECF service in compliance with Rule 5 of the Federal Rules of Civil Procedure on July 29, 2022:

  Josh Borsellino
  Borsellino, P.C.
  1020 Macon St., Suite 15
  Fort Worth, Texas 76102
  Telephone: (817) 908-9861
  Facsimile: (817) 394-2412
  josh@dfwcounselc.com

         */s/ Robert J. Sutphin*
         Robert J. Sutphin

19348765_v1

131438509.2